## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-CV-23888-RAR

**ERIC VOLPE,** *et al.*, *each individually and*
*on behalf of others similarly situated*,

       Plaintiffs,

v.

**VMSB LLC**,

       Defendant.

_____/

### <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** comes before the Court on Plaintiffs' Motion for Summary Judgment as to Liability, [ECF No. 90], and Defendant's Motion for Summary Judgment as to Liability, [ECF No. 91]. Plaintiffs work at a restaurant that Defendant operates. Plaintiffs have alleged that Defendant has failed to provide them with overtime wages as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203 *et seq*. Defendant replies that Plaintiffs are exempt as a matter of law from the FLSA's overtime requirements, because they are service-and-retail employees who operate on a commission-based salary scheme. *See* 29 U.S.C. § 207(i). Plaintiffs contend that Defendant breached a contract that detailed how employees would receive mandatory "service charges" that customers provided, but Defendant retorts that the "contract" to which Plaintiffs refer is an employment policy that did not create actionable contractual rights as a matter of law. And while Plaintiffs suggest that Defendant unlawfully withheld tips, *see* 29 U.S.C. §§ 203(m)(2)(B), 216(b)(2), Defendant responds that Plaintiffs have failed to provide any evidence to support their claim. Having carefully considered the parties' Motions, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment as to Liability, [ECF No. 90], is **DENIED**, and Defendant's Motion for Summary Judgment as to Liability, [ECF No. 91], is **GRANTED** as set forth herein.

## BACKGROUND

### A. Factual Background

VMSB ("Defendant") operates Gianni's at the Villa ("Gianni's"), a restaurant that serves locals and tourists in Miami Beach, Florida. [ECF No. 92] at ¶ 1. To help run the business, Gianni's has hired servers, bartenders, and captains. [ECF No. 89] at ¶ 1. Plaintiffs are a class of employees who work at Gianni's. *See* [ECF No. 103].

VMSB tracks its employees' salary on a weekly basis. [ECF No. 92] at ¶ 33. Three calculations gave rise to Plaintiffs' biweekly salary. [ECF No. 92-2] at ¶ 10. First, Plaintiffs received a base, flat hourly pay for each hour worked. [ECF No. 89] at ¶ 7; [ECF No. 98] at ¶ 7; [ECF No. 92] at ¶ 4. While that base hourly rate is now $8.98, the base hourly wage was between $6.98 and $8.98 per hour worked during the relevant employment period in this case. [ECF No. 89] at ¶ 9; [ECF No. 92] at ¶ 4; [ECF No. 98] at ¶ 7.

Plaintiffs' salary was also contingent on a distributed Service Charge. The Service Charge is pegged at a nonnegotiable twenty percent and is added to the bill of every diner. [ECF No. 89] at ¶ 2; [ECF No. 92-1] at 3; *see also Rosell v. VMSB, LLC*, No. 20-20857, 2021 WL 4990913, at *10–11 (S.D. Fla. June 22, 2021), *report and recommendation adopted*, 2022 WL 898589 (S.D. Fla. Mar. 28, 2022) (finding that the service charge at issue in this case was mandatory). The Service Charge would be distributed to employees in "front-of-house" positions (captains, servers, bartenders, back-servers, bussers, and hostesses) depending on their role in servicing customers. To calculate the value of the distributed Service Charge, each employee in a front-of-house position was assigned a value between 1 through 6. [ECF No. 92] at ¶ 5. That

value, when multiplied by the number of hours each employee worked for a given shift, would determine each front-of-house employee's portion of the distributed Service Charge.  *Id.*  Two factors could affect the amount of money a front-of-house employee would receive from the distributed Service Charge from paycheck to paycheck.  For one, revenue could change from shift-to-shift, depending on the volume of sales, number of diners served, and the price of food and beverages ordered by each diner.  *Id.* at ¶ 8; [ECF No. 95-2] at 71:4-19; 72:9-15; 72:21–73:1; 73:11–74:6.  For another, the value of the distributed Service Charge would increase or decrease depending on the number of front-of-house employees who worked per shift.

Discretionary gratuities ("Discretionary Gratuities") that diners gave to employees on their final bill were the third component of Plaintiffs' salary.  [ECF No. 89] at ¶ 40.  VMSB informed employees that they could keep the Discretionary Gratuities they received.  *Id.*  Plaintiffs could—and sometimes did—share their Discretionary Gratuities with other employees at Gianni's, [ECF No. 92] at ¶ 27, but VMSB did not establish a policy that mandated or enforced their sharing. [ECF No. 92] at ¶ 30.

Upon hire, employees had to sign documents, including an employee handbook, that  made plain Gianni's policies and procedures.  [ECF No. 92] at ¶ 13.  The handbook stated that there would be "no express or implied contract of employment resulting from said handbook" and instead stated that it was "merely a means of establishing specific guidelines . . . so that [the restaurant] might better help [employees] achieve [their] personal and professional goals."  [ECF No. 92-1] at 151.  The handbook also explained that employees would be entitled to overtime wages in accordance with applicable law.  *Id*. at 154.

VMSB also asked employees to sign a "F&B Service Distribution" document ("Distribution Policy").  [ECF No. 89-5].  The Distribution Policy "memorialize[d] and circulate[d] a policy that outline[d] the distribution [of the Service Charge] to staff and house

employees," *id.* at 1, and "set a guideline for consistency and efficiency in compliance with federal and state guidelines." *Id.* The Distribution Policy also explained that "[c]ustomer gratuity/tips shall be retained by the staff member who received the gratuity and is not affected by the distribution of the Service Charge." *Id.* New staff members signed a revised Distribution Policy in 2021 when VMSB changed its formula for distributing the Service Charge to reduce the total amount of the Service Charge given to front-of-house employees, reduce the points distribution for backservers, and increase those backservers' hourly flat rate of pay. [ECF No. 98] at ¶ 56; [ECF No. 67-1] at ¶ 8.

### B. Procedural Background

Plaintiffs—a group of servers, captains, and bartenders at Gianni's—filed this suit on October 11, 2023, against Defendant. [ECF No. 1]. The operative Complaint, filed on May 16, 2024, seeks relief against Defendant on three counts. [ECF No. 79]. Count I alleges that Defendant violated the FLSA when it failed to pay overtime wages to Plaintiffs at a rate of one-and-a-half times the regular rate of pay for all hours worked over forty (40) hours in a workweek. [ECF No. 79] at 4–5. Count II alleges a breach of contract under common law, contending that Defendant materially breached obligations it established to Plaintiffs in its Distribution Policy by factoring in front-of-house employees who were not actually employed by VMSB into the Service Charge distribution calculation. *Id.* at 5–7. Count III alleges that Defendant violated the FLSA by confiscating Discretionary Gratuities that were voluntarily given to Plaintiffs by customers. *Id.* at 7–9.

Defendant disputes Plaintiffs' claims on each Count. As to Count I, Defendant argues that, as a matter of law, it falls within section 7(i) of the FLSA, which exempts employees from the FLSA's overtime requirements if they (i) work in a retail and service establishment; (ii) their regular rate of pay is one and a half times the minimum hourly rate; and (iii) more than half of the

employee's compensation is from commissions.  [ECF No. 91] at 3.  As to Count II, Defendant contends that the Distribution Policy is not a contract as a matter of Florida law.  *Id.*  And as to Count III, Defendant states that Plaintiffs have failed to show sufficient facts to support their claim.

Both Plaintiffs, *see* [ECF No. 90], and Defendant, *see* [ECF No. 91], have filed Motions for Summary Judgment as to all Counts.  The matter is now ripe for review.[1]

## LEGAL STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alterations and internal quotation marks omitted)

---

[1] Plaintiffs have filed a Statement of Material Facts in Support of their Motion for Summary Judgment, [ECF No. 89], as has Defendant, *see* [ECF No. 92].  Each party has filed Responses and Replies to the opposing party's Statement of Material Facts.  *See* [ECF No. 96] (Plaintiffs' Response); [ECF No. 98] (Defendant's Response); [ECF No. 105] (Plaintiffs' Reply); [ECF No. 104] (Defendant's Reply).  And each party has filed Responses and Replies to the other party's Motion for Summary Judgment.  *See* [ECF No. 97] (Plaintiffs' Response in Opposition); [ECF No. 99] (Defendant's Response in Opposition); [ECF No. 106] (Plaintiffs' Reply); [ECF No. 107] (Defendant's Reply).

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A nonmoving party that seeks to establish a dispute of fact must "set forth specific facts showing that there is a genuine issue for trial." *A.L. by and through D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018).  To that end, a nonmoving party "may not rest on the mere allegations or denials of his pleading." *Id.*  "The nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law." *Tidwell v. Carter Prod.*, 135 F.3d 1422, 1425 (11th Cir. 1998).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion." *Travelers Indem. Co. of Am. v. Deauville Hotel Prop.*, 533 F. Supp. 3d 1287, 1290–91 (S.D. Fla. 2021).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotations and citations omitted).  Thus, a court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  *See Travelers Indem. Co. of Am.*, 533 F. Supp. 3d at 1290–91.

## ANALYSIS

### A.  Evidentiary Issues

The parties dispute the evidentiary sufficiency of numerous facts.  Plaintiffs contend that the deposition testimony of Plaintiffs Volpe and Matino that Defendant cites in its Statement of Material Facts, [ECF No. 92], is inadmissible, because Defendant did not make certain pages of that testimony "part of the record."  [ECF No. 96] at ¶ 12; *see also id.* at ¶¶ 18–25, 28–30, 34–35.  This argument is superfluous.  Defendant cited those deposition transcripts in its Statement and forgot to attach those transcripts as exhibits when filing.  *See* [ECF No. 92] at ¶¶ 12, 20–25, 28–

30 (citing Excerpts of the Deposition of Eric Volpe dated June 21, 2024 ("Volpe Dep."), [ECF No. 92-2], and Excerpts of the Deposition of Vincenzo Matino dated July 1, 2024 ("Matino Dep."), [ECF No. 92-1]). But Defendant informed the Court of its error in a Notice of Filing Corrected Exhibits that was filed prior to Plaintiffs' Reply. *See* [ECF No. 95]. It would be strange for the Court to preclude Defendant from citing Plaintiffs' own words in a Statement when Plaintiffs have shown no bad-faith attempt from Defendant to hinder Plaintiffs' ability to thoroughly respond to Defendant's motions and statements. The Court declines to produce such an inexplicable result here. *See Fils v. City of Aventura*, 647 F.3d 1272, 1283–84 (11th Cir. 2011) (considering late-filed evidence that was accessible to both parties and would not result in prejudice).

Plaintiffs also contest both the testimony and sworn declarations of Daniel Tamir (Defendant's corporate representative) and Stefano Di Giulio (the general manager of Gianni's), stating that the declarations are "inadmissible hearsay." [ECF No. 96] at ¶¶ 12, 18-20, 22, 34-35, 37]; *see* Fed. R. Civ. P. 56(c)(2) (noting that parties may object that materials used to cite or dispute a fact on a motion for summary judgment cannot be presented in a manner admissible in evidence). But Plaintiffs provide no law or facts to contravene Defendant's well-taken point that the Tamir and Di Giulio Declarations are based on personal knowledge, have been made in the presence of competent witnesses, and have been executed under penalty of perjury. *See* 28 U.S.C. § 1746; Fed. R. Civ. P. 56(c)(4). Courts have routinely allowed sworn declarations as evidence in summary judgment, and this Court declines to entertain Plaintiffs' argument to the contrary, especially where Plaintiffs have not provided any legal or factual basis for their claim that an otherwise sworn declaration is "inadmissible hearsay." *See Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147, 2022 WL 1447733, at *31 (S.D. Fla. May 9, 2022).

Plaintiffs fail to raise genuine or material facts regarding the validity of Defendant's payroll statements, and their attempts to characterize Defendant's evidence as a sham declaration lack legal or factual support.  Plaintiffs seem to suggest that certain portions of Defendant's Reply Statement of Material Facts are sham declarations because they conceal evidence of immigration fraud. [ECF No. 106] at 3.  Plaintiffs assert that Defendant employs "outsourced workers" who "do not appear as employees in VMSB's payroll tax records for the statutory period." [ECF No. 106] at 10.  But Plaintiffs fail to advance any proof that these outsourced workers violated federal immigration law, or that Defendant has failed to verify these workers' immigration status.  *Id.* at 3.  And they mistakenly suggest that the inclusion of "fictitious monikers" in Defendant's payroll, like "ART FOOD," "JAZZ RENTAL," "VENTUM MARIS," and "ATLANTIC," further such unlawful actions.  *Id.*  Indeed, Plaintiffs provide no genuine issue of material fact to rebut Defendant's assertion that the "fictitious monikers" that Plaintiffs take issue with are just ways to track the weekly payments Defendant made to staffing agencies on a spreadsheet.  *See* [ECF No. 98] at ¶¶ 62–70.  In sum, the specter of a supposed immigration violation does not create the sort of factual issue that would lead the Court to conclude that Defendant's Reply Statement of Material Facts is somehow a sham.

On the other hand, Plaintiffs *have* provided a document in support of their Motion for Summary Judgment that constitutes a sham declaration.  Plaintiffs rely on the July 11, 2024 Declaration of Eric Volpe ("Volpe Declaration"), [ECF No. 88].  The Volpe Declaration makes several assertions that "contradict[ ], without explanation, previously given clear testimony." *PayRange, Inc. v. KioSoft Techs., LLC*, No. 20-20970, 2023 WL 436887, at *8 (S.D. Fla. June 8, 2023).  While the Volpe Declaration asserts that it is "common knowledge" among "employees" that VMSB "uses workers who are not legally eligible to work in this country," Volpe Decl. at ¶ 29, Mr. Volpe himself stated in a prior deposition that he did *not* know whether employees

Defendant hired were lawfully eligible to work in the country. [ECF No. 98-1] at 139:15–140:12. Further, though the Volpe Declaration states that Defendant "requires" servers to share cash tips with "back runners or bussers," Volpe Decl. at ¶ 31, Mr. Volpe stated in his deposition that he would not get into trouble with Gianni's management for not tipping, *see* [ECF No. 98-1] at 38:24–45:17, and Plaintiff Vincenzo Matino indicated that Defendant suggested that servers share tips without imposing any kind of obligation. [ECF No. 95-1] at 50:3–14. The Volpe Declaration also states that Defendant took a "tip credit" from Plaintiffs, Volpe Decl. at ¶¶ 14, 33, but Volpe admitted that he did not know whether Defendant *actually* confiscated those tips. [ECF No. 98-1] at 44:9–20. Plaintiffs provide nothing in their papers to rebut the inherent inconsistencies between the Volpe Declaration and Plaintiffs' earlier deposition testimony that has been properly admitted into the record, and the Court can accordingly discard the offending portions of the Volpe Declaration in evaluating the cross-motions for summary judgment. *See Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012).

### B. Plaintiffs Are Exempt from Overtime Pay Under Section 207(i)

The FLSA mandates that employers cannot employ any employees who are "engaged in commerce" for a "workweek longer than forty hours" unless the employee receives compensation for their overtime work "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). These overtime requirements do not apply for employees who work in a "retail or service establishment." § 207(i). The 207(i) exemption disclaims overtime liability for employers

> if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of

compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

§ 207(i). Defendant and Plaintiffs disagree over whether the 207(i) exception applies here.

As a procedural matter, Plaintiffs dispute that Defendant has properly pleaded that the exception applies, because it referred to the wrong subsection of section 207 in its Answer. *See* [ECF No. 96] ¶¶ 34, 35, 37; [ECF No. 90] at 8 n.2. Defendant disagrees, noting that it invoked the "retail or services establishment exemption" throughout its Answer and this litigation. *See* [ECF No. 82] at ¶¶ 3, 4, 8, 11; [ECF No. 107] at 6–7. In response, Plaintiffs state that they would not qualify for the exemption as a legal matter, because Defendant cannot establish that the disbursed Service Charge that "restaurant wait-staff" receive qualifies as a "bona fide commission" under section 207(i)'s understood meaning. [ECF No. 90] at 11–13. Defendant disagrees with Plaintiffs' legal conclusion, stating that it is undisputed that Gianni's is a service establishment and that Plaintiffs' regular rate of pay, as a factual matter, exceeds one-and-a-half times the minimum hourly rate. [ECF No. 91] at 9–10. Further, Defendant contends that service charges, in the manner Defendant has established, are a "commission" under the meaning of section 207(i). *Id.* at 11–13.

Upon review, the Court finds that Plaintiffs fall within the section 207(i) exemption. Plaintiffs' central claim that Defendant has failed to plead section 207(i) as an affirmative defense is unavailing, because a cursory reading of Defendant's pleadings and posture throughout this litigation make clear that Defendant intended to invoke the exception despite a scrivener's error. And as a matter of law, the Court finds that Gianni's employees are subject to the 207(i) retail and service establishment overtime exemption, because Defendant has met its burden of showing that

the three requirements for employees to qualify under the exemption have been met.  As explained, Defendant is entitled to summary judgment on Count I.

> ### (i)   Defendant Has Properly and Consistently Pleaded Section 7(i) as an Affirmative Defense.

Plaintiffs repeatedly—and unsuccessfully—suggest that Defendant failed to properly plead section 207(i) as an affirmative defense.  *See* [ECF No. 97] at 3, 5–6; [ECF No. 106] at 2–4.  In support, Plaintiffs contend that the eighth affirmative defense Defendant raised in its Answer to Plaintiffs' Second Amended Complaint incorrectly cited section 207(a) instead of section 207(i). [ECF No. 82] at ¶ 8.  But though Defendant did cite to the wrong subsection of a statute in one affirmative defense, that scrivener's error should not doom Defendant's ability to raise that affirmative defense, especially where Defendant cited to the "retail and services establishment exemption" in that defense and elsewhere in its Answer.  [ECF No. 82] at ¶¶ 3, 4, 8, 11; *see N. Brevard Hosp. Dist. v. McKesson Techs., Inc*., No. 616-637, 2017 WL 11667659, at *7–8 (Oct. 10, 2017) (finding that a citation to an alternate subsection of a statute would not preclude a defendant's raising of an affirmative defense).

Plaintiffs have known about the 207(i) exemption from this case's inception.  In response to Plaintiffs' Statement of Claim [ECF No. 14], Defendant stated on December 4, 2023 that "Plaintiffs were classified as exempt from the FLSA's overtime requirements under the retail or services establishment exemption *pursuant to 29 U.S.C. § 207(i)*, in light of the redistributed Service Charges/commissions that they customarily received from VMSB as a majority of their weekly pay."  [ECF No. 23] at 4–5 (emphasis added).  Plaintiffs' prior statements to the Court acknowledge that they have been aware of Defendant's intention.  *See* [ECF No. 50] ("[VMSB] maintains that the Service Charge belongs to the restaurant, it also maintains that the 20% Service Charge is a 'sales commission' payable to the servers and that, as such, Plaintiffs are exempt

employees, not subject to the overtime provisions of the FLSA.").  Indeed, Mr. Volpe himself cited section 207(i) in an April 8, 2024 Declaration in explaining why Defendant does not pay overtime premiums.  [ECF No. 49-1] at ¶ 9.  Defendant's consistent invocation of the exemption as a defense, along with Plaintiffs' seeming awareness of that invocation, suggests that Defendant's scrivener's error is not prejudicial enough for Plaintiffs to foreclose Defendant from using the exemption in this litigation.

### (ii)    Plaintiffs Meet the Section 207(i) Factors for Exemption from the FLSA's Overtime Requirements.

The parties' dispute over Count I centers on whether Plaintiffs fit within the 207(i) exemption to the FLSA's overtime requirements.  These requirements are generally meant "to spread out employment by placing financial pressure on the employer to hire additional workers rather than employ the same number of workers for longer hours" as well as "to compensate employees who for a variety of reasons worked overtime."  *Klinedinst v. Swift Invs.*, 260 F.3d 1251, 1256 n.4 (11th Cir. 2021) (citations omitted).  The 207(i) exemption is designed to "ensure that workers who are paid on a commission basis are guaranteed to receive at least the legislated minimum wage without requiring them to work overtime for it."  *Id.* at 1256.  For employees to fit within the exemption, an employer must show that (1) it is a retail or service establishment, (2) the employees' "regular rate of pay" exceeds 1.5 times the "applicable minimum wage," and (3) more than half of the employees' compensation during the relevant period consists of *commissions* on goods and services.  *See* 29 U.S.C. § 207(i).  Defendant, as the employer, bears the burden of proving that Plaintiffs fit within the section 207(i) exception by "clear and affirmative evidence."  *Klinedinst*, 260 F.3d at 1254.

The FLSA does not define the term "commission," and determining the scope of the term "finds little illumination from the sparse case law and various references in statutes and

regulations." *Id.* at 1254; *see Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir. 1987) (Posner, J.) (looking to statutory purpose in assessing whether hotel banquet servers could qualify for the 207(i) exemption).  One regulation does suggest that the statutory exemption applies to employees in

> so-called "big ticket" departments and those establishments or parts of establishments where commission methods of payment traditionally have been used, typically those dealing in furniture, bedding and home furnishings, floor covering, draperies, major appliances, musical instruments, radios and television, men's clothing, women's ready to wear, shoes, corsets, home insulation, and various home custom orders. *There may be other segments in retailing where the proportionate amount of commission payments would be great enough for employees employed in such segments to come within the exemption.* Each such situation will be examined, where exemption is claimed, to make certain the employees treated as exempt from overtime compensation under section 7(i) are properly within the statutory exclusion.

29 C.F.R. § 779.414 (emphasis added).  But the regulation does not describe the exemption on its own terms and instead prescribes a certain class of employees for whom the exemption ought to apply.  Without further clarity, the Court gives the exemption "a fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018); *see also Mechmet*, 825 F.2d at 1175 (interpreting the commissions exemption by assessing how it "functions in the overall scheme of the overtime provisions and whether its functioning would be assisted by classifying banquet service charges as commissions").

### (a)  Gianni's is a Retail or Service Establishment

Defendant easily satisfies the first requirement—that it operates Gianni's, which is a retail or service establishment.  To qualify, Gianni's must be open to the general public and have seventy-five percent of its revenue generated from services "not for resale."  *See* 29 C.F.R. §§ 779.411, 779.319.  In addition, Gianni's must be "recognized as retail sales or services" in its particular industry.  29 C.F.R. § 779.319.  It is undisputed that Defendant meets the first two requirements,

as more than seventy-five percent of the annual dollar volume received by Gianni's is for services not for resale.  [ECF No. 92] at ¶ 1; [ECF No. 96] at ¶ 1.

Plaintiffs suggest that restaurants are not "recognized as retail sales or services" by asserting that "no trial court, appellate court, federal or state, published or unpublished, has ever concluded that restaurant wait-staff are exempt employees for purposes of the exemption." [ECF No. 97] at 14.  Yet Plaintiffs' attempts to categorically distinguish restaurant workers are unavailing for two reasons.  The 207(i) inquiry requires courts to evaluate "[e]ach such situation" where the exemption is claimed, consider whether the employer has instantiated a "commission method[] of payment," and adjudicate accordingly.  29 C.F.R. § 779.414; *see also Brennan v. Great Am. Disc. & Credit Co., Inc.*, 477 F.2d 292, 296 (5th Cir. 1973) ("In trying to define the characteristics of such an establishment, the regulations acknowledge that a precise line cannot be drawn and exact objective standards cannot be established.").  Reading the exemption in the manner Plaintiffs request would undercut statutory guidance that one must focus on the nature of the *establishment* that seeks an exemption and not the *workers* who are employed within that establishment.  *See* 29 C.F.R. § 779.320 ("The regulations explain that Congress intended that the term 'retail or service establishment' to denote the traditional local retail or service establishment such as . . . restaurants . . . that serve the everyday needs of the community in which they are located.").

More importantly, cases in this circuit *have* treated restaurant workers who receive a flat Service Charge as exempt from overtime under section 207(i).  In *Compere v. Nusret Miami, LLC*, the Eleventh Circuit considered whether a district court had correctly applied the 207(i) exemption to a set of restaurant workers who received a distributed eighteen-percent service charge as part of their pay.  28 F.4th 1180, 1184 (11th Cir. 2022).  In affirming the district court's decision, the Eleventh Circuit concluded that these service charges would be part of an employee's "regular rate

of pay," and further concluded that those employees could satisfy the 207(i) exemption on their own terms. *Id.* at 1186–88. Other courts have similarly applied the 207(i) exemption to restaurant workers after considering the facts of the case at hand. *See, e.g.*, *Diggs v. Ovation Credit Servs. Inc.*, 449 F. Supp. 3d 1280, 1288 (M.D. Fla. 2020) (recognizing restaurants as service establishments under the FLSA); *see also, e.g.*, *Nascambeni v. Quayside Place Partners, LLC*, No. 09-23322, 2010 WL 2351467, at *1–3 (S.D. Fla. June 11, 2010) (granting summary judgment for a defendant who employed banquet servers who were paid under a split compensation structure, reasoning that the "service charge" portion of the servers' income was a commission that "would qualify for certain exceptions to the overtime wage laws"); *Diaz v. Amedeo Hotels Ltd. P'ship*., No. 12-CV-4418, 2016 WL 1254243, at *3 (E.D.N.Y. Mar. 29, 2016) (finding that room service waiters were exempt from the FLSA's overtime requirements because "[m]andatory services for waiters that are calculated as a percentage of the total banquet bill qualify as commissions for purposes of the 7(i) exemption" (citing *Mechmet*, 825 F.2d at 1178)). This Court sees no reason to depart from this conclusion.

### (b) *Plaintiffs' Regular Rate of Pay Exceeds One and One-Half Times the Minimum Hourly Rate*

To satisfy the second requirement, Defendant must show that "[t]he 'regular rate' of pay" for Plaintiffs was "more than one and one-half times the minimum hourly rate." 29 C.F.R. § 779.412. The "regular rate of pay" is "the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed," and "by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." § 779.419(b) (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945)). The regular rate of pay is an employee's total compensation divided by the number of hours that employee actually worked in the workweek. *See Klinedinst*,

260 F.3d at 1256; *Freixa v. Prestige Cruise Servs., LLC*, 853 F.3d 1344, 1346 (11th Cir. 2017) (noting that the FLSA contemplates the employment of a person "for a workweek").  Neither party disputes *how* Defendant pays Plaintiffs—a base hourly wage, plus Service Charge distributions, plus Discretionary Gratuities paid directly to the employee who received them.  [ECF No. 92] at ¶ 4; [ECF No. 96] at ¶ 4.  And neither party disputes that Plaintiffs were paid a base of between 5.65 to 8.98 per hour as a base cash wage.  [ECF No. 67-1] at 3; [ECF No. 98] at ¶ 5.  The factual issue is whether Plaintiffs' regular rate of pay is, in fact, one and one-half times the applicable minimum wage.[2]

Defendant has met its burden to show that Plaintiffs' regular rate of pay exceeds this threshold.  Defendant relies on a sworn declaration from Daniel Tamir, VMSB's Director of Accounting.  [ECF No. 92-1]; *see* Fed. R. Civ. P. 56(c)(4) (requiring that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *see ABCO Premium Fin. LLC v. Am. Int'l. Grp.*, No. 11-23020, 2012 WL 3278628, at *4 (S.D. Fla. Aug. 9, 2012) (noting that "the court must review the evidence submitted in support of each cross-motion" (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)).  Mr. Tamir's declaration states that he "started formally documenting the regular rate of pay for calculating eligibility to take the 207(i) exemption for [front-of-house] employees like Plaintiffs on a weekly

---

[2]  The relevant period is from October 2020 onward.  During this time, the federal minimum wage has remained consistent at $7.25 per hour.  Florida's minimum wage has increased per year.  In 2020, the minimum wage was $8.56 per hour; from January 1, 2021, through September 29, 2021, the minimum wage was $8.65 per hour; from September 30, 2021, through September 29, 2022, the minimum wage was $10.00 per hour; from September 30, 2022, through September 29, 2023, the minimum wage was $11.00 per hour; and from September 30, 2023 through the filing of the cross-motions, the minimum wage was $12.00 per hour.  To qualify for the exemption, then, an employee's regular rate of pay would have to exceed $18.00 per hour.  [ECF No. 92] at ¶ 36.

basis" and included the data for the "7i Spreadsheets" for each Plaintiff in his declaration. *See* [ECF No. 92-1] at ¶¶ 8–10. Mr. Tamir noted that the 7i Spreadsheets, attached to his Declaration as "Exhibit A," indicate whether Plaintiffs qualified for the exemption "[i]f the sum of the hourly flat pay and the service charge redistribution exceed[ed] one and one-half (1.5x) minimum wage for all hours during the respective week" by marking each Plaintiff as "TRUE." *Id*. at ¶ 9. Mr. Tamir averred that "Plaintiffs . . . never earned less than one and one-half times (1.5x) the minimum wage for any workweek ($18.00)." *Id*. at ¶ 10. The weekly pay sheets that Mr. Tamir provided as Exhibit A to his Declaration confirm this asserted fact; every Plaintiff, as the record shows, received a regular rate of pay that was over one and one-half times the minimum wage. [ECF No. 92-1] at 9–67.

To be sure, a court has denied Defendant's prior invocation of the 207(i) exception in a case that involved the same pay schedule, reasoning that Defendant had not "maintain[ed] records of all hours worked by its employees in each workday and the total hours worked in each workweek." *Rosell*, 2021 WL 4990913, at *19. That said, Defendant has shown in *this* case that it now maintains daily "Z-Reports" that "contain a breakdown of total sales, revenues and tips received by servers," [ECF No. 92-1] at ¶ 16, and that it "started formally documenting the regular rate of pay" to maintain compliance with the 207(i) exemption in 2020. *Id.* at ¶ 9.

Plaintiffs suggest that the Declaration of Mr. Tamir is not attached to their declaration and does not appear in the record of this case; in the alternative, Plaintiffs argue that the Declaration is "inadmissible hearsay." [ECF No. 105] at ¶ 75. Neither assertion is well-taken, as the Declaration satisfies all requirements of Rule 56(c)(4) and "evidence may be considered on summary judgment provided that 'its contents can be presented in admissible form at trial.'" *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 325 (5th Cir. 2024). In any event, Plaintiffs' assertions, without further citations or support, fail to present a *genuine* issue of material fact to rebut Defendant's evidence

in the record that the regular rate of pay for all Plaintiffs was over one and one-half times the minimum wage for any workweek. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record.").

### (c) More than Half of Plaintiffs' Compensation Consisted of Commissions

This case turns on the applicability of the exemption's third prong to Plaintiffs—whether Defendant has met the retail or services establishment exception in treating Defendant's biweekly salaries to Plaintiffs as "commissions earned from the sale of goods or services." The record shows that more than half of each Plaintiff's income derived from the distributed Service Charge. *See* [ECF No. 92-1] at 79–90. The legal issue is whether these Service Charges are "commissions," which "is an issue of law ripe for resolution" upon a motion for summary judgment. *See Klinedinst*, 260 F.3d at 1254.

The FLSA does not define what a "commission" is. *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 278 (3d Cir. 2010). Legislative history doesn't help, *see Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007), but the Department of Labor's regulations instruct that "[a] commission rate is not bona fide if the formula for computing the commissions is such that the employee, in fact, always or almost always earns the same fixed amount for compensation for each workweek." 29 C.F.R. § 779.416. As the Department has reasoned, a commission is not bona fide if it does not "bear[ ] a *direct* relationship to the sale of goods and services by the establishment." Dep't of Labor Op. Ltr., 1997 WL 971257 (Aug. 29, 1997). The Department of Labor has considered mandatory service charges for restaurant servers, bartenders, and bussers as a "commission[ ] on goods and services" for purposes of the 207(i) exemption. *Id.*

Employees who operate under an incentive-based pay structure often find themselves within the 207(i) exemption. In *Klinedinst v. Swift Investments, Inc.*, the Eleventh Circuit assessed whether a plaintiff who was compensated "according to a repair estimate"—a system that considered the auto shop's hourly rate as well as the "flag hours" that it would normally take in the auto-repair industry to finish a given task—fit within the 207(i) exemption. 260 F.3d at 1253. In concluding that this "flat rate system" was a commission, the Eleventh Circuit noted that courts should assess whether a pay system furthers "the purpose or logic behind overtime." *Id.* at 1256 Specifically, the Court concluded that "the function of a commission exemption . . . is to ensure that workers who are paid on a commission basis are guaranteed to receive at least the legislated minimum wage without requiring them to work overtime for it." *Id.* The commission system in *Klinedinst* fit within the exemption because the wage structure provided "incentives for employees to work efficiently and effectively to the benefit of the employer, who may then take on more customers at a greater profit margin, and the employee, who reaps the benefits of increased flag hours regardless of the time worked." *Id.*

*Klinedinst*'s logic on incentives applies even when employers distribute service charges on a team-wide basis. In *Yi v. Sterling Collision Centers*, the Seventh Circuit found that auto-repair servicers who were assigned to perform specific jobs as part of a team and received individual distributions of a commission proportionate to their actual hours worked fell within the 207(i) exemption. 480 F.3d at 509. The Court reasoned that the exemption applied because "[t]he faster the team works, the more it earns per number of hours, since its commission is based not on the total number of hours it puts in on a job but on the number of booked hours times each team member's booked-hour rate." *Id.*; *see also Reed v. Brex, Inc.*, 8 F.4th 569, 576 (7th Cir. 2021).

Similarly, courts have found that service charges distributed on a team-wide basis to servers fall within the exemption regardless of the number of guests handled by each server. In

*Mechmet v. Four Seasons Hotels, Ltd.*, the Seventh Circuit allowed a pay structure to be classified as a commission, reasoning that "a more lucrative" way to handle a service charge would be for regular banquet waiters to "divide up the service charge the hotel affixes to every banquet charge" on a team-wide basis.  825 F.3d at 1177; *see also Nascembeni v. Quayside Place Partners LLP*, No. 09-23322, 2010 WL 2351467, at *4 (S.D. Fla. June 11, 2010) (reasoning that banquet servers who were paid with both an hourly rate and a "service charge" distributed to each server fell within the 207(i) exemption because the service charge was a bona fide commission).

There is no difference between the pay structures in *Yi* and *Mechmet*—and the incentives they produce—and the pay structure at issue in this case.  Plaintiffs' pay is incentive-based because it is "directly proportional to the total revenue collected from customers" and "varies shift-to-shift and week-to-week based on the amount of each guest's total bill, as well as the number of guests who dine at the restaurant during any particular shift."  [ECF No. 99].  The pay structure Plaintiffs receive is variable and dependent not only on the hours each Plaintiff worked but their role in each daily shift.  Certain workers, like captains, servers, and bartenders, receive higher "numerical values" that would allow them to receive a greater share of the Service Charge distribution. [ECF No. 92-1] at ¶¶ 6–7.

As the record indicates, each Plaintiffs' Service Charge distribution would rise and fall based on the *total* service charge revenues Gianni's would collect in a workweek; an employee's incentive, then, would be to work to increase the revenue of the restaurant per shift, regardless of the number of hours (and base hourly rate) the employee worked in the shift.  [ECF No. 98-1] at 72:20–74:4; 74:8–20.  As Mr. Volpe noted in his deposition, "if everybody sells more, of course the service charge will be more."  *Id*. at 74:18–20.  Because the Service Charge distribution is *not* a function of the number of guests each employee individually serves and is instead a function of

the number of guests *all* employees serve in a workweek, the pay structure incentivizes *all* employees to work more efficiently.

Plaintiffs' alternative legal support—a nonprecedential, out-of-circuit, four-factor test to determine whether a Service Charge is a "bona fide commission rate," [ECF No. 97] at 10—is unavailing. This four-factor test provides that a "commission rate . . . should not give employees a fixed compensation amount irrespective of their efforts or sales." *Alban v. 2K Clevelander LLC*, No. 17-23923, 2018 WL 4859068, at *4 (S.D. Fla. Aug. 28, 2018). To determine a "bona fide" rate, according to Plaintiffs, the test asks

> (1) whether the commission is a percentage or proportion of the ultimate price passed onto the customer; (2) whether the commission is decoupled from actual time worked, providing an incentive for the employee to work efficiently and effectively; (3) whether the type of work lends itself to a standard eight-hour work day; and (4) whether the commission system offends the purposes of the FLSA.

*Id*.; *see also* [ECF No. 97] at 10 (citing *Casanova v. Gold's Tex. Holdings Grp., Inc.*, No. 13-1161, 2016 WL 1241548, at *8–9 (W.D. Tex. Mar. 23, 2016) (applying similar test)). But Plaintiffs' use of *Casanova* to suggest that this Court should focus on percents, proportionalities, and prices instead of incentives falls flat, for courts in this circuit have repeatedly concluded after *Klinedinst* that the "most important" feature of a payment plan is whether it is "incentive-based." *Jones v. Tucker Comm'cns, Inc.*, No. 11-398, 2013 WL 6072966, at *10 (M.D. Ga. Nov. 18, 2013); *Buttita v. DirecTV LLC*, No. 14-566, 2017 WL 10456972, at *33 (N.D. Fla. Sept. 28, 2017) ("[T]he Court finds there is no strict requirement that the amount of pay be proportional to the amount charged."); *Jones*, 2013 WL 6072966, at *11 ("[P]roportionality does not seem to be required for a payment plan to constitute commissions in the Eleventh Circuit.").

Plaintiffs attempt to raise a few factual issues to rebut the argument that the Service Charge is a commission, but none impact this Court's legal conclusion. First, Plaintiffs note that the

calculations used for disbursing each employee's proportion of the Service Charge is confidential. Per this argument, it would be impossible for employees to be "incentivized" to work harder if they are unaware of their regular rate of pay and how much more they would need to work on a weekly basis to increase their pay. *See* [ECF No. 89] at ¶¶ 23, 27, 37, 42, 48; [ECF No. 90] at 12. But the record indicates that employees *were able* to ask for their distribution or calculation for the Service Charge if requested, *see* [ECF No. 93-4] at 120:20–121:19, and Plaintiff Volpe admitted in his deposition that he *would* be able to see daily Service Charge reports if he requested. [ECF No. 98-1] at 49:12–51:2, 60:21:61:24.   In any event, the incentive structure Defendant created offers benefits for employees as a *team* to work more efficiently, because more tables served would increase the total Service Charge per shift.

Plaintiffs also contend that Defendant utilized "fictitious monikers" to distribute money from each week's Service Charge revenues to non-employees.   [ECF No. 90] at 15; [ECF No. 89] at ¶¶ 29–38.   But the "fictitious monikers" represent payments between VMSB and the staffing agencies that provided VMSB with additional Staffed Employees.   [ECF No. 98] at ¶ 62; [ECF No. 89-7].   Plaintiffs were well aware that these Staffed Employees would work with VMSB employees on a regular basis, and that no distinction existed between the types of work that Staffed Employees would perform.   [ECF Nos. 95-2, 98-1] at 106:9–107:17, 126:24–127:2, 129:23–130:4. Further, the record shows—and Plaintiffs do not rebut—that Staffed Employees would appear on the same daily timesheet as VMSB employees.   [ECF Nos. 95-2, 98-1] at 107:18–109:9.   The "fictitious monikers" Plaintiffs point to were in fact internal methods of categorizing how much VMSB would pay staffing agencies for the time Staffed Employees worked, pursuant to a flat hourly rate that was *separate from* the Service Charge VMSB employees received.   *See* [ECF No. 101-1] at 102:1–104:9.   Ultimately, Plaintiffs have not provided evidence that would call into question either how Staffed Employees were paid or whether the staffing agencies Defendant used

to supplement its workforce were fictitious. And their attempts to craft a genuine issue of material fact on the basis of "fictitious monikers" do not rebut the legal conclusion that VMSB employees were paid a separate Service Charge that operated as a commission.

### C. The Service Charge Distribution Policy is Not a Contract

Count II of Plaintiffs' Second Amended Complaint alleges that Defendant "promised to pay Plaintiffs . . . a flat hourly wage, plus a calculated and negotiated ninety percent [ ] share of a so-called 'Service Charge' collected from customers, who pay the 'service charge' at the conclusion of their meal." [ECF No. 79] at 6. Plaintiffs further contend that Defendant "breach[ed] its agreement and promise to pay Plaintiffs" by failing to disburse and calculate the Service Charge in accordance with the company's policies and procedures. *Id*. at 6–7. In response, Defendant argues that Plaintiffs cannot raise a common-law breach-of-contract claim, because there was no contract that Defendant breached. Defendant notes that the agreement upon which Plaintiffs rest their claim was actually a Service Charge Distribution Policy that "memorialize[d]" and "outline[d] the distribution" of the Service Charge without giving rise to any independent, enforceable contract rights. [ECF No. 99] at 16–17; [ECF No. 82] at 11 (stating that "no contractual agreement exists between Plaintiffs and VMSB" as an affirmative defense).

The parties agree that the document at issue in Count II is a "Service Charge Distribution Policy." [ECF No. 90] at 16; [ECF No. 99] at 16–17. And the parties do not dispute the contents of the Service Charge Distribution Policy, "which purports to describe the manner in which [each Plaintiff and other employees'] respective share of the [Service Charge] will be disbursed to eligible pool participants." [ECF No. 89] at ¶ 20; *see* [ECF No. 98] at ¶ 20. The parties also do not dispute that "[a] management representative also signs the document, and a fully-executed copy is maintained in the personnel file of each eligible pool participant." [ECF No. 89] at ¶ 21; *see* [ECF No. 98] at ¶ 21. Plaintiffs have provided testimony showing that Gianni's—and VMSB

by extension—would inform new hires of the restaurant's Service Charge policy and would have each employee sign documents that would inform them of the existing policy. [ECF No. 89-1] at 59:13–60:6. The issue, then, is whether the Service Charge Distribution Policy and its contents constituted a contract as a matter of law.

The Service Charge Distribution Policy is a two-page document meant "[t]o memorialize and circulate a policy that outlines the distribution to staff and house employees of compulsory Food and Beverage [ ] Service Charges . . . added to all Food and Beverage services for Gianni's Restaurant," and "[t]o manage the Service Charge distribution in a manner that is fair and consistent for all employees involved." [ECF No. 89-1] at 448. The document also "set[s] a guideline for consistency and efficiency in compliance with federal and state guidelines." *Id.* In addition, the document establishes "[p]rocedure[s]" that explain how the automatic Service Charge would be disbursed, and also has a chart that explains the "points" that factor into each front-of-house employee's overall disbursement. Each employee and the manager had an opportunity to sign the document. That said, it is undisputed that Plaintiffs did not negotiate—and did not feel that they could negotiate—the terms of the Service Charge Distribution Policy. [ECF Nos. 95-2, 98-1] at 94:19–95:21, 96:2–97:14.

The dispute over the Service Charge Distribution Policy is a matter of contract interpretation; to resolve the issue, the Court applies Florida state law. *See Trailer Bridge, Inc. v. Ill. Nat'l Ins. Co.*, 657 F.3d 1135, 1141 (11th Cir. 2011); *see also Peacock Constr. Co. v. Mod. Air Conditioning, Inc.*, 353 So. 2d 840, 842 (Fla. 1977) (noting that the interpretation of a contract is a matter of law). And for the Service Charge Distribution Policy to constitute a contract, the necessary elements include: "(1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). While an "offer" requires courts to look to "what a reasonable person in the position of the

parties would have thought it meant," *see Kolodziej v. Mason*, 996 F. Supp. 2d 1237, 1247 (M.D. Fla. 2014) (quoting *Jackson v. Inv. Corp. of Palm Beach*, 585 So. 2d 949, 950 (Fla. 4th DCA 1991)), policy statements given to employees after an employment contract's formation do not create independent and enforceable contract rights. *Vega*, 564 F.3d at 1273 (quoting *Quaker Oats Co. v. Jewell*, 818 So. 2d 574, 576–77 (Fla. 5th DCA 2002)).

Courts in this circuit have repeatedly made this legal point where compensation plan documents are at issue. *OneSource Facility Services, Inc. v. Mosbach* is instructive. In that case, plaintiff alleged that defendants breached a document "that outlined the terms of bonus compensation paid to OneSource Vice Presidents." 508 F. Supp. 2d 1115, 1122 (M.D. Fla. 2007). The court flatly rejected the plaintiff's argument that the document was a contract. Under Florida law, the court noted that "an employee's mere expectations, however reasonable," are insufficient to establish binding contractual obligations. *Id.* (citing *Tohma v. Spalding & Evenflo Cos., Inc.*, 724 So. 2d 693, 694 (Fla. 2d DCA 1999)). The court then looked at the bonus-and-commissions policy to conclude that its terms did not establish an offer to constitute a contract. For one, the policy allowed the employer to retain "the right to amend, alter, or terminate the [ ] plan at any time," which would "render[ ] any promise illusory and unenforceable." *Id.* at 1122 (first citing *Johnson Enter. of Jacksonville, Fla., Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311–12 (11th Cir. 1998); and then citing *Rosenberg v. Lawrence*, 541 So. 3d 1204, 1206 (Fla. 3d DCA 1988) (explaining that where one party retains the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound)). Even though a party may have had an "expectation that he would receive a [ ] bonus," the court reasoned that the terms of the document indicated that "there was no contractual duty on the part of [plaintiff] to pay [defendant] . . . bonuses under the [document]." *Id.* at 1123. This was true even though the terms of the document described that the bonus "would be based on annualized performance and

calculated according to a specific formula considering specific performance elements." *Id.*  Courts have similarly rejected arguments that policy statements are contractual agreements, *see Butterworth v. Lab'y Corp. of Am. Holdings*, 581 F. App'x 813, 820 (11th Cir. 2014), and have further noted that such policy statements "do not give rise to enforceable contract rights in Florida unless they contain specific language which expresses the parties' explicit mutual agreement that the manual constitutes a separate employment contract."  *Vega*, 564 F.3d at 1273 (quoting *Quaker Oats*, 818 So. 2d at 576–77).

A plain reading of the Service Charge Distribution Policy shows that it contained no offer for Plaintiffs to accept.  Plaintiffs do not rebut Defendant's statement that "the distribution practices referenced in the Policy were already in place when the Policy was first presented to [front-of-house] employees." [ECF No. 92] at 4–5.  And it is undisputed that Plaintiffs signed the Policy at the beginning of their employment. [ECF No. 89] at ¶ 18.  Though Plaintiffs may have certainly expected that the terms of the Policy would remain, and that the overall distribution of charges would remain constant at ninety-percent to front-of-house employees, the Policy they signed only served to "memorialize" and "outline[] the distribution" of the Service Charge and "[t]o manage the Service Charge distribution in a manner that is fair and consistent for all employees involved." [ECF No. 89-5] at 1.  There is no language in the document that establishes a contractual duty to pay Plaintiffs in accordance with the agreement, just as there is no language that suggests that Defendant was bound by the "outlines" of the Policy's terms.  And though Plaintiffs are correct that "employees are entitled to recover their unpaid, *negotiated* wages and commissions earned" under Florida law, [ECF No. 97] at 17 (citing *Hingson v. MMI of Fla., Inc.*, 8 So. 3d 398, 400–01 (Fla. 2d DCA 2009)), the parties do not dispute that there was no negotiation—and therefore no bargain wrought—over the Service Charge Distribution Policy. [ECF Nos. 95-2, 98-1] at 94:19–95:21, 96:2–97:14.

While Plaintiffs may have certainly believed that the Policy was a "promise," *see* [ECF No. 89] at ¶¶ 4, 18–19, the fact that Defendant could "retain[ ] to itself the option of fulfilling or declining to fulfill its obligations under the contract" indicates that the Policy was never a contract, regardless of how reasonable Plaintiffs' beliefs were. *Rosenberg*, 541 So. 2d at 1206 (collecting cases); *see also Tohma*, 724 So. 2d at 694. Given that Plaintiffs have failed to establish that an alleged violation of the Service Charge Distribution Policy is a breach of contract under Florida law, Defendant is entitled to summary judgment on Count II.

**D.  Plaintiffs Have Not Alleged a Claim for Tip Confiscation**

Plaintiffs allege that Defendant confiscated Plaintiffs' earned "tips" in violation of the FLSA. [ECF No. 90] at 17. In support, Plaintiffs allege that VMSB "required" its employees to "tip out" "bussers" and "back servers" in order to "subsidize payment to workers at its restaurants." *Id.* at 18. In response, Defendant states that Plaintiffs have not pleaded sufficient facts to support their claim. [ECF No. 91] at 20. Upon review, the Court agrees with Defendant that Plaintiffs' purported facts find scant support in the record.

Plaintiffs' claim rests on 29 U.S.C. § 203(m)(2)(B). Section 203(m)(2)(B) prohibits employers from keeping "tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." If an employer is found liable for withholding an employee's earned tips, then they shall have to pay the affected employee's "amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an equal amount as liquidated damages." 29 U.S.C. § 216(b).

The Court has addressed and rejected a more expansive view of Plaintiffs' claims that would treat VMSB's distributed Service Charge as a tip. [ECF No. 63]; *see also Rosell v. VMSB, Inc.*, No. 23-12658, 2024 WL 1617821, at *3 (11th Cir. Apr. 15 ,2024) ("[W]e hold that VMSB's

service charge is not a discretionary tip for purposes of the Fair Labor Standards Act and that distributions from the service charge to employees may be lawfully counted against VMSB's minimum wage obligations.").  In its Order Granting Defendant's Motion to Dismiss Plaintiffs' Amended Complaint, *see* [ECF No. 35], the Court noted that "[t]he Eleventh Circuit has unequivocally rejected the theory that a 'service charge' is a discretionary tip and cannot offset Defendant's minimum wage requirements under the [FLSA]."  [ECF No. 63] at 2.  The Court further explained that, because the Service Charge was not a discretionary tip, Plaintiffs could not "characterize the service charge as voluntary" to maintain a claim for tip confiscation under 29 U.S.C. § 203(m)(2)(B) and § 216(b)(2).  Because of this, the Court directed that "Plaintiffs cabin the allegations in Count III to the tips that customers pay *over and above* the service charge," absent a good-faith basis for pleading that the Service Charge had become a discretionary tip since the Eleventh Circuit's opinion in *Rosell*. *Id.* (citing *Rosell*, 2024 WL 1617821, at *2) (emphasis in original).  Given this Court's prior rulings regarding Count III, this particular count concerns only whether Defendant violated 29 U.S.C. § 203(m)(2)(B) and § 216(b)(2) in its distribution of Plaintiffs' Discretionary Gratuities, and nothing more.

Plaintiffs present a host of facts to show that VMSB unlawfully confiscated or withheld Plaintiffs' duly earned Discretionary Gratuities, but none of these facts are genuine or material. Plaintiffs argue that "VMSB enforces the use of Plaintiffs' cash tips to subsidize payment to workers at its restaurant."  [ECF No. 89] at ¶ 44.  In support, Plaintiffs cite to paragraph 31 of the Volpe Declaration, which states that "VMSB *requires* that Servers share the few cash tips we receive directly in hand from customers (as opposed to credit card transactions) with back-runners or bussers, telling us they will work harder once we pay them.  There is no record kept regarding the amounts of these payments, but they roughly approximate the hourly amount of the maximum conditional tip credit permitted by law."  Volpe Decl. at ¶ 31; *see also* [ECF No. 90] at 18 ("VMSB

enforces the use of Plaintiffs' cash tips to subsidize payment to workers at its restaurant.").  But, as explained above (*see supra* at 9), this statement contradicts Volpe's prior deposition testimony that he would not get into trouble with Gianni's management for not tipping, *see* [ECF No. 98-1] at 38:24–45:17; *see also* Matino Dep. at 50:3–14 (stating that Defendant suggested that servers share tips without imposing any kind of obligation).  And while the Volpe Declaration asserts that VMSB took a "tip credit," *see* Volpe Decl. at ¶ 33, Mr. Volpe admitted that he did not know whether Defendant actually confiscated those tips.  [ECF No. 98-1] at 44:9–20.  The inherent contradiction between the Declaration's assertions and Mr. Volpe's prior deposition testimony leads the Court to disregard these averments in the Volpe Declaration.

Other facts Plaintiffs present in support of their position are similarly unavailing or contradicted by the record.  Plaintiffs assert that

> VMSB avoids the disbursement of 'voluntary tips' given to the Plaintiffs . . . because it manipulates the amounts payable as 'service charge' by adding hours of work performed or not performed by non-employees and non-eligible employees . . . . [and] can minimize the amounts they allocate as due to Plaintiffs as 'service charges' by manipulating data attributable to fictitious monikers and persons or entities who are non-eligible to participate in the pool.

[ECF No. 89] at ¶ 41; *see also* [ECF No. 90] at 18 (citing [ECF No. 89] at ¶ 41).  This assertion, however, presents several problems.  As an initial matter, Plaintiffs do not back up their claim that Defendant manipulates the amount of Discretionary Gratuities due with any evidence in the record. *See Lofton v. Sec'y of Dep't of Children & Fam. Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

Plaintiffs' claim that Defendant uses "persons or entities who are non-eligible to participate in the pool" is similarly unavailing.  Even if Plaintiffs were able to demonstrate that Defendant

employs undocumented workers, *see* [ECF No. 106] at 6–7, that fact would concern Defendant's alleged violation of federal immigration laws and would not be "material under the substantive law governing the case." *Lofton*, 358 F.3d at 809.  The record shows that the "fictitious monikers" Plaintiffs take issue with are instead internal record-keeping mechanisms for Defendant to pay staffing agencies for Staffed Employees.  [ECF No. 98] at ¶ 62; [ECF No. 89-7]; *see supra* at 22 –23.  In short, Plaintiffs' assertion that Defendant "manipulates" the amount of the Discretionary Gratuity given to employees is not "supported by citation to authority and appropriate analysis." *Watts v. Silverton Mortg. Spec., Inc.*, 378 F. Supp. 3d 1164, 1177 n.3 (N.D. Ga. 2019).

Lastly, Plaintiffs suggest that VMSB's records contain "negative 'red ink' adjustments," and that Defendant "manipulate[s] the service charge distributions inversely with relative collections of voluntary tips by it."  [ECF No. 90] at 18.  But Plaintiffs never mentioned these allegations as a basis for their tip confiscation claim in the Second Amended Complaint.  *See Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1238 (S.D. Fla. 2008) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion for summary judgment." (citation omitted)).  Even if Plaintiffs had pleaded these allegations successfully, they'd face another problem—the payroll evidence and calculations Defendant presents do not show the kinds of adjustments and manipulations asserted by Plaintiffs. *See* [ECF No. 92-1] at 10–78.  And while Mr. Volpe asserts that "[o]n at least one occasion VMSB memorialized in a paystub . . . its taking of a tip credit without providing notice under § 203," deposition testimony indicates that this was due to a documentation error that was later rectified. [ECF No. 101-1] at 44:15–45:5; 139:1–144:3; [ECF No. 98-4] at 120:2–13.

Indeed, the record shows that the total tips Mr. Volpe received, as delineated in Defendant's daily reports, matches the amount of tips Mr. Volpe actually received in his paycheck.  *See* [ECF

No. 92-1] at ¶ 19; *see also id.* at 101–42.  At bottom, there is simply no record evidence in support of Plaintiffs' claim under Count III.  Accordingly, Defendant is entitled to summary judgment on Count III.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment as to Liability, [ECF No. 90], is **DENIED**, and Defendant's Motion for Summary Judgment as to Liability, [ECF No. 91], is **GRANTED**.   Accordingly, it is hereby

**ORDERED AND ADJUDGED** that summary judgment is **GRANTED** in favor of Defendant VMSB LLC.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, final judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida this 28th day of March, 2025.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**